UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOY ROBERTS,

      Plaintiff,

v.                                                CASE NO.:

AIR EXPERTS TODAY CORP, a
Florida Corporation,

      Defendant.

_____/

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, JOY ROBERTS (hereinafter "Plaintiff"), by and through her undersigned counsel, brings this action against Defendant, AIR EXPERTS TODAY CORP. (hereinafter "Defendant"), and in support of her claims states as follows:

**JURISDICTION AND VENUE**

1. This is an action for damages for violations of the Fair Labor Standards Act, 29 U.S.C. § 206 (hereinafter "FLSA"), the Americans with Disabilities Act, 42 U.S.C. 12112(a) (hereinafter "ADA"), and Florida law. Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as these claims are related to Plaintiff's federal claims and arise from the same case or controversy as Plaintiff's federal claims.

3. This Court has original and personal jurisdiction over this action because Defendant is engaged in business within the State of Florida, and the action complained of occurred within Florida.

4. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

5. At all times material to this action, Plaintiff has been a resident Manatee County, Florida.

6. Defendant operates an air conditioning repair, maintenance, and installation company with a principal place of business located at 1715 Independence Blvd., Suite B-1, Sarasota, Florida 34234.

## ALLEGATIONS AND FACTS

7. Plaintiff has satisfied all conditions precedent to filing this action, or they have been waived. Specifically, Plaintiff was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission ("EEOC") on January 13, 2021. A copy of the Notice is attached hereto as Exhibit "A."

8. Plaintiff has hired the undersigned law firm and agreed to pay them a fee.

9. At all times relevant to this action, Defendant employed approximately twenty (20) employees.

10. At all times relevant to this action, Defendant's gross annual sales made or business done has been in excess of $500,000.00.

11. At all times relevant to this action, Defendant was an "employer" engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(d).

12. Defendant operates in interstate commerce by, among other things, purchasing goods and materials used in their business and sold to customers from manufacturers and suppliers across the United States.

13. Plaintiff was hired by Defendant in or around August 2019.

14. Plaintiff worked for Defendant as a salesperson and air conditioning technician throughout the duration of her employment.

15. Plaintiff's principal duties were to perform routine service calls, and on those calls, attempt to sell customers additional products and services. Plaintiff also performed maintenance and various other installation tasks on customers' air conditioning units.

16. Plaintiff was compensated on both a base salary and commission basis throughout her employment.

17. On February 6, 2020, Plaintiff was directed by her manager, Defendant's CEO Ryan Diedrich, to execute a "Contract and Bill of Sale for Automobile." The basis of the arrangement was that Mr. Diedrich would transfer the title and registration of a vehicle owned by Defendant into Plaintiff's name, pay for the car insurance on the vehicle (while the insurance policy was also under Plaintiff's name), and pay for all expenses related to the transfer of title to Plaintiff. Once Plaintiff's employment ended, the contract mandated that Plaintiff would sell the vehicle back to Defendant for a nominal, illusory amount of money. This contract is attached hereto as Exhibit "B."

18. In March 2020, Plaintiff was involved in a horrific car accident while driving from a service call. She was driving the work vehicle referenced in paragraph 17 above.

19. As a result of the accident, Plaintiff was air-lifted to the nearest emergency room to undergo surgery for a spinal fracture and five broken ribs. She remained at the hospital for several days to recover.

20. After waking up from surgery, on March 18, 2020, Plaintiff texted Mr. Diedrich to let him know that she had been in an accident, that she sustained a broken back and ribs, and that she was still in the Intensive Care Unit. Further,

the text asked that Mr. Diedrich give her a call. Mr. Diedrich did not respond to the text message[1].

21. The next day, Plaintiff sent another text message to Mr. Diedrich, noting that she had tried to call him, but he did not answer. Further, she asked to be provided with paperwork to start a worker's compensation claim and asking what she needed to do to start being treated through worker's compensation. Mr. Diedrich responded that he was at a job and would try and get the information for her the next day. In the exchange, he asked that Plaintiff get the invoices out of the van (that had been in the accident) and the "3000 dollars worth of halos out of there too bc Gemaire has zero stock." Plaintiff responded that she was still in the hospital but would get everything when she could. Mr. Diedrich responded, "No you don't understand, we had 2 sell yesterday and one cancelled bc we didn't have any." Throughout the exchange, Mr. Diedrich persistently pushed and pressured Plaintiff, who was sitting in the ICU a day removed from emergency surgery, to get to the van and bring him invoices and product, along with a signed and notarized power of attorney so that he could access the van. Plaintiff acquiesced to the extent she physically could and attempted to help Mr. Diedrich find more halos by contacting other vendors from her hospital bed.

---

[1] The text messages between Plaintiff and Mr. Diedrich referenced throughout this Complaint are attached hereto as Composite Exhibit "B."

22. In another text message dated March 19, 2020, at 8:16 P.M., Mr. Diedrich indicated that the van had arrived. Plaintiff asked that he call her in the morning the next day.

23. The next day, at 12:20 P.M., Plaintiff had yet to receive a call from Mr. Diedrich. Accordingly, she texted him asking that he retrieve her anxiety medication out of the van. He responded, "Joy you can get what ever you want out of it, I have had no chance to do anything with it."

24. At this point, Mr. Diedrich had not yet provided any information to Plaintiff regarding her worker's compensation claim. Accordingly, she texted him on March 20th, 2020, asking if he could provide that information. He responded that they (presumably the worker's compensation carrier) were waiting on drug test results.

25. On March 21st, at 2:05 P.M. (a Saturday), Plaintiff sent another text message to Mr. Diedrich asking him for information on how she could start being treated through the worker's compensation system, saying "I got to see somebody Monday." Mr. Diedrich never responded.

26. On March 23, 2020, at 9:06 A.M., Plaintiff again requested worker's compensation information from Mr. Diedrich. She received no response.

27. Later that day, she made an additional request that Mr. Diedrich send her most recent paycheck. He responded, "K."

28. Later that day, Plaintiff reiterated her request for worker's compensation information, pleading, "I am in a lot of pain and I need to see a doctor ASAP." Mr. Diedrich responded, "They told me to go ahead and go. They won't do anything until they have results." Plaintiff responded that any worker's compensation doctor could request her test results, and "I've done everything I can do on my end I've signed all the medical release forms they say I won't get my records in 3 to 5 business days as to where a doctor can get them stat please give me any information that you have so I can move forward thank you." Mr. Diedrich, in response, claimed "I tried to work on it today, but waiting on a call. Bc of this virus thing no one ones to answer or return calls! That's why workman's comp said just to go to the doctor I assume."

29. Plaintiff called her doctor immediately, who informed her that she needed a claim number or her insurance information. She texted Mr. Diedrich to let him know that all of her insurance information was still in the van she was driving at the time of the accident (which Defendant had taken custody of) and asked for his help in getting her insurance card from the van. Mr. Diedrich did not respond to this text.

30. The next day, Mr. Diedrich sent Plaintiff an audio recording, stating, "Looks like you have been the hold up." Plaintiff responded that she listened to the recording and had completed all the tasks mentioned in the recording. She

then asked for the worker's compensation insurance carrier's name. Mr. Diedrich did not respond.

31. On March 30, 2020, Plaintiff texted Mr. Diedrich and told him that her drug test results came back negative, and again pleaded with him to get a phone number for the worker's compensation carrier. Mr. Diedrich did not respond.

32. Later that day, she asked Mr. Diedrich if her last paycheck was mailed. He responded that it was.

33. Plaintiff then asked, again, if he had the number for Defendant's worker's compensation carrier. He responded, "Looking now," however did not respond for the rest of the day.

34. The next day, Plaintiff texted Mr. Diedrich again, saying, "It's just a name and number I need to see a doctor please just give me the info." Mr. Diedrich responded on April 1, 2020, saying, "Please direct all questions through your attorney, thank you."

35. Plaintiff sent numerous text messages to Mr. Diedrich afterwards that were all ignored. At some point, the text messages began indicating they could not be delivered, which is indicative of Mr. Diedrich blocking Plaintiff from contacting him.

36. On April 6, 2021, Plaintiff texted Mr. Diedrich asking about her paycheck from the two weeks prior to her accident, indicating that it should be for around $9,000.00 (before tax deductions). All of these texts were ignored.

37. To date, Plaintiff has not received any compensation whatsoever for the two weeks she worked prior to her car accident.

38. Defendant was aware, or should have been aware, that Plaintiff performed work which required she be compensated at least the minimum wage prescribed by the FLSA.

39. In light of Plaintiff's numerous requests for her final paycheck, Defendant's failure to pay her any wages whatsoever for her last two (2) weeks of work was willful and intentional.

40. On June 19, 2020, Plaintiff filed a charge of discrimination with the EEOC.

41. Prior to this date, Plaintiff had not received any further communications from Mr. Diedrich, or any other employee, manager, or director for Defendant. Accordingly, her employment was terminated, either actually or constructively.

42. Prior to becoming injured and requesting information worker's compensation claim information from Defendant, Plaintiff was an employee in good standing with a strong sales record. She had not recently been subject to any type of employee discipline or reprimand whatsoever.

43. Defendant retaliated against Plaintiff after she repeatedly requested information on how to file a worker's compensation claim by:

   a. Persistently refusing to provide her any information on how to file a claim;

   b. Failing to file the claim themselves upon notice of her work-related injury;

   c. Withholding wages earned by Plaintiff but not yet paid at the time of her accident and hospitalization;

   d. Terminating Plaintiff's employment, either actually or constructively, by refusing to respond to or communicate with Plaintiff in any way, blocking her from contacting her supervisor by phone, and insisting that all communication between Plaintiff and Defendant be through her worker's compensation attorney.

44. As described herein, Defendant's retaliatory actions toward Plaintiff in response to her request for worker's compensation claim information was intentional and malicious.

45. Further, Defendant discriminated against Plaintiff by unilaterally terminating her employment almost immediately after she became injured, and before a doctor could examine or diagnose her, to determine what

accommodations Plaintiff would need to continue performing the essential functions of her job.

46. After her car accident, and at the time of her termination, Plaintiff was disabled within the meaning of the ADA in that she suffered from a medical condition that substantially interfered with activities of her daily living, such as walking, standing, bending, and lifting.

47. Plaintiff was a qualified individual within the meaning of the Americans with Disabilities Act, in that she could perform the essential functions of her job with reasonable accommodations. Specifically, Plaintiff would have been able to perform her duties if given a short period of time off from work to recover from her surgery and injuries.

48. A request for a short period of time off from work to recover would not have caused Defendant to suffer an undue hardship.

**COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT
FAILURE TO PAY MINIMUM WAGES**

49. Plaintiff incorporates by reference all allegations numbered 1-48 contained above into this Count, as if fully stated herein.

50. The FLSA, 29 U.S.C. § 206, requires employers to pay employees at least the prescribed minimum wage of $7.25 per hour.

51. At all relevant times, Defendant was an employer engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 203.

52. At all relevant times, Plaintiff was an "employee" of Defendant, within the meaning of the FLSA.

53. Defendant failed to pay Plaintiff the federally mandated minimum wage of $7.25 per hour from March 2, 2020 to March 16, 2020.

54. Defendant's unlawful conduct, as described in this Complaint, was willful and intentional. Defendant was aware or should have been aware that the practices described in this Complaint were unlawful. Defendant did not make a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff during this time period.

55. As a result of Defendant's willful violations of the FLSA, Plaintiff has suffered damages, is entitled to all unpaid minimum wages, an equal amount as liquidated damages, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. § 201, *et seq*.

## COUNT II: VIOLATION OF FLA. STAT. § 448.08
## FAILURE TO PAY WAGES EARNED

56. Plaintiff incorporates by reference all allegations numbered 1-48 contained above into this Count, as if fully stated herein.

57. At all relevant times, Plaintiff was employed by Defendant within the meaning of Florida Statute § 448.101(2).

58. At all relevant times, Defendant was Plaintiff's employer within the meaning of Florida Statute § 448.101(3).

59. From March 2, 2020 to March 16, 2020, Defendant suffered or permitted Plaintiff to work on its behalf.

60. From March 2, 2020 to March 16, 2020, Defendant failed to compensate Plaintiff for her work, in accordance with the wages Defendant promised to pay to Plaintiff in exchange for working for Defendant.

61. As a result of Defendant's failure to compensate Plaintiff during this time period, she has suffered damages, is entitled to all wages earned but unpaid, prejudgment interest, and attorneys' fees and costs incurred in bringing this action.

**COUNT III: VIOLATION OF FLORIDA STATUTE § 440.205
WORKER'S COMPENSATION RETALIATION**

62. Plaintiff incorporates by reference all allegations numbered 1-48 contained above in this Count, as if fully stated herein.

63. At all relevant times, Plaintiff was an employee of Defendant within the meaning of Fla. Stat. § 440.02(15)(a).

64. At all relevant times, Defendant was Plaintiff's employer, within the meaning of Fla. Stat. § 440.02(16)(a).

65. Plaintiff engaged in statutorily protected activity by requesting information on how to file a worker's compensation claim from Defendant's CEO, Ryan Diedrich.

66. Plaintiff was subjected to the adverse employment actions of termination and the withholding of pay after making multiple requests for such information.

67. Plaintiff's termination and the withholding of her pay was caused by her multiple requests for information on how to file a claim for worker's compensation benefits.

68. Defendant also failed to report Plaintiff's injury to their worker's compensation carrier within seven (7) days of becoming aware of Plaintiff's injuries, in violation of Florida law.

69. Defendant engaged in intimidation and coercion by refusing to speak with or communicate with Plaintiff after she requested information on how to file a worker's compensation claim.

70. As a result of Defendant's intentional and malicious actions and conduct, Plaintiff has suffered damages, including but not limited to lost wages, back pay, future lost wages, emotional distress, loss of the ability for the enjoyment of life, prejudgment interest, and attorneys' fees and costs incurred in bringing this action.

## COUNT IV: DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

71. Plaintiff incorporates by reference all allegations numbered 1-48 contained above in this Count, as if fully stated herein.

72. Plaintiff was an employee of Defendant pursuant to the ADA.

73. Defendant was Plaintiff's employer within the meaning of Title I of the ADA, in that they employ more than 15 employees.

74. Plaintiff suffered the adverse employment actions of termination and withholding of pay.

75. At the time her pay was withheld, and at the time she was terminated, Plaintiff was disabled within the meaning of the ADA, as her medical condition substantially limited her ability to stand, walk, lift and bend.

76. Plaintiff was a qualified individual within the meaning of the ADA in that she could have performed the essential functions of her job with reasonable accommodations, specifically, a short period of time off from work to recover from surgery and her injuries.

77. Such a request would not have forced Defendant to suffer an undue hardship.

78. Plaintiff was discriminated against on the basis of her disability when Defendant unilaterally withheld her pay, refused to communicate with her, and terminated her employment less than two (2) weeks from the date of her accident.

79. Defendant further discriminated against Plaintiff by refusing to speak with her for any reason less than two (2) weeks after her accident.

80. As a result of Defendant's discrimination, Plaintiff has suffered damages, including compensatory damages, lost wages, lost benefits, future lost wages, emotional distress, prejudgment interest, and attorneys' fees and costs incurred in bringing this action.

81. Defendant's conduct was willful, intentional, and malicious, entitling Plaintiff to an award of punitive damages.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 28(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint and on all other issues so triable.

DATED this 7th day of April, 2021.

Respectfully submitted by:

*/s/ Nicholas J. Castellano, II*
Nicholas J. Castellano, II, Esq.
Florida Bar Number: 0118601
nick@buckmanandbuckman.com

*/s/ Y. Drake Buckman, II*
Y. Drake Buckman, II, Esq.
Florida Bar Number: 0137634
attorney@buckmanandbuckman.com

**BUCKMAN & BUCKMAN, P.A.**
2023 Constitution Boulevard
Sarasota, FL  34231
Telephone: (941) 923-7700
Fax: (941) 923-7736

*Attorneys for Plaintiff*